**U.S. Department of Justice**

*United States Attorney*
*Southern District of New York*

*The Jacob K. Javitz Federal Building*
*26 Federal Plaza, 37th Floor*
*New York, New York 10278*

October 24, 2024

**VIA ECF & EMAIL**

The Honorable Jed S. Rakoff
United States District Judge
Southern District of New York
500 Pearl Street
New York, New York 10007

      Re:    <u>United States v. Renny Antonio Parra Paredes</u>, S1 23 Cr. 504 (JSR)

Dear Judge Rakoff:

    The defendant in the above-captioned case (the "defendant" or "Parra Paredes") is scheduled to be sentenced on October 31, 2024, at 11:00 a.m., for his role in a conspiracy that used a daycare facility in the Bronx to traffic fentanyl, killing a 22-month-old baby, causing serious bodily injury to a 25-month-old baby, and poisoning two additional babies, ages eight and 25 months. All of those children were poisoned by fentanyl that the defendant and his co-conspirators deliberately hid inside of a daycare.

    The Government respectfully submits this letter in connection with the defendant's sentencing. The applicable United States Sentencing Guidelines ("Guidelines" or "U.S.S.G") range is life imprisonment with a mandatory minimum sentence of 10 years. Probation has recommended that a sentence of 240 months' imprisonment be imposed. Because the defendant's culpability is only slightly less than co-defendant Felix Herrera Garcia ("Herrera Garcia"), who Your Honor recently sentenced to 45 years' imprisonment, the Government requests that a far higher sentence than what Probation has recommended—one of at least 40 years (480 months)—be imposed.

**I.    Offense Conduct**

    **A.  The Events of September 15, 2023 at Divino Niño Daycare**

    On Friday, September 15, 2023, between approximately 8:25 a.m. and 8:45 a.m., four healthy babies— N.F.D. , A.G. , K.G. , and J.L. [1]—ranging in age from eight to 25 months, were dropped off at Divino Niño Daycare (the "Daycare") in the Bronx by their parents. (PSR ¶ 15). It was the last day of N.F.D. 's and J.L. 's first full week at the Daycare. After engaging in morning activities, the four children were fed lunch by Grei Mendez ("Mendez"), the owner and

---

[1] In prior filings and the PSR, N.F.D. is Minor Victim-1, A.G. is Minor Victim-2, K.G. is Minor Victim-3, and J.L. is Minor Victim-4.

operator of the Daycare, and Herrera Garcia's wife. Three of the children—N.F.D., A.G., and K.G.—were then put down for a nap. The fourth child, J.L., was picked up early by his mother at approximately 12:50 p.m. (PSR ¶ 15).

Several hours later, when Mendez went to wake the children, she found N.F.D. and A.G. unresponsive. (PSR ¶ 15). Mendez then placed a series of phone calls. First, she called the community center in the Bronx that oversaw the Daycare and had assigned the four children present that day to Mendez's care. (PSR ¶ 15). She then called Herrera Garcia. After speaking with Herrera Garcia for approximately ten seconds, she hung-up with him and called 911. (PSR ¶ 15).

In the moments following Mendez's call to Herrera Garcia, Herrera Garcia rushed through the front door of the Daycare. Approximately two minutes later, he exited the Daycare and ran out the back door of the building in which the Daycare was located. (PSR ¶ 16). Although Herrera Garcia was empty-handed when he entered the Daycare, he left carrying two weighted bags. Herrera Garcia then climbed through the bushes behind the Daycare and fled the scene, all before the arrival of emergency personnel and all while N.F.D. and A.G., ages 22 and 25 months, respectively, were lying unresponsive on the floor. (PSR ¶ 16).

A few minutes after the defendant fled the Daycare, A.G.'s and K.G.'s mother arrived at the scene. After looking through the windows to the Daycare, she rushed inside and found Mendez holding K.G., while A.G. laid unconscious on the floor. (PSR ¶17). After clearing a path for emergency personnel by holding open the entrance to the Daycare for a period of time, she ran back inside the Daycare, picked-up her unresponsive son, and carried him outside to the street where she desperately attempted to revive him. (PSR ¶ 17). Soon thereafter, emergency medical personnel arrived at the scene and sprung into action. One of the emergency medical technicians immediately began providing medical care to A.G.. Another hurried inside the Daycare. There he found N.F.D., lifeless on the floor with blue lips, no pulse, and no respiration. He picked N.F.D. up and carried him to an ambulance to be rushed to the hospital. (PSR ¶ 17).

Despite the arrival of emergency medical responders and transfer to the hospital, the prognosis for both A.G. and N.F.D. was dire. When A.G. arrived at the hospital, he was in acute respiratory failure, meaning that he had limited-to-no breathing. (PSR ¶ 19). Through the administration of Narcan (a drug used to treat opioid overdoses), however, physicians were able to revive him. Even one dose of Narcan, though, was not sufficient; physicians ultimately had to put him on an intravenous Narcan drip to keep him from drifting back into an overdose. (PSR ¶ 19).

N.F.D. was not so fortunate. Despite intensive intervention by doctors, nothing could bring him back. For approximately 30 minutes after arriving at the emergency room, doctors worked frantically to revive him. N.F.D. never regained a pulse. The emergency room physician who treated N.F.D. and then informed N.F.D.'s parents of his death has described that experience as one of the worst of her life. (PSR ¶ 18).

K.G. was also brought to the hospital and treated. Though she was conscious, she failed to respond properly to pain stimuli. (PSR ¶ 19). She similarly received Narcan and improved. J.L., who had been picked up from the Daycare earlier in the day, was taken to a different hospital

by his parents after he showed signs of illness. (PSR ¶ 19). He was also determined to be suffering from opioid exposure.

Toxicology tests performed on all four children who had been present at the Daycare—N.F.D., A.G., K.G., and J.L.—revealed the presence of fentanyl. (PSR ¶ 19). N.F.D.'s cause of death was determined to be acute fentanyl intoxication. (PSR ¶ 20).

### B. The Searches of the Daycare

In the hours following the poisoning of the children, law enforcement personnel conducted a search of the Daycare, which was operated out of a one-bedroom apartment in the basement of a residential building in the Bronx. (PSR ¶ 22). During the course of that search, law enforcement officers found a kilogram-sized brick of fentanyl and two "kilo press" machines used to compress powdered narcotics into brick form in a closet within the Daycare. (PSR ¶ 22). Law enforcement officers also found a hydraulic jack used to operate the presses. (PSR ¶ 22). The defendant's fingerprints were found on one of the kilo presses and the hydraulic jack. (PSR ¶ 22). The brick and one of the kilo presses is pictured below.




Approximately six days later, on September 21, 2023, law enforcement officers searched the Daycare a second time. (PSR ¶ 23). This time, they found much more. Hidden under the floor tiles in the playroom of the Daycare, beneath the playmats and the cribs, were two "traps"—that is, compartments used to conceal narcotics and narcotics packaging paraphernalia. (PSR ¶ 22). Pictured below is one of the traps found underneath a playmat. The photograph on the left depicts the position of the playmat in the playroom; the photograph on the right reveals the trap underneath the playmat. The plunger that is visible in the photograph on the right was used to lift the floor tiles and expose the trap.

 

Inside the traps, law enforcement officers found over eleven kilograms of narcotics as well as stamps, glassines, and other paraphernalia used in packaging, distributing, and trafficking narcotics. (PSR ¶ 23). All of the packages of narcotics found in the traps contained fentanyl or one of its analogues; most also contained heroin. (PSR ¶¶ 45-46). One of the fully exposed traps is pictured below, along with a set of glassines stamped with the label "Red Dawn," which were among the paraphernalia found in one of the traps.

 

### C. The Defendant's Arrest

Although the defendant lived with Herrera Garcia and Mendez in an apartment located in the building adjacent to the Daycare building (PSR ¶ 28), following the poisoning of the babies, he hid-out in another apartment in the Bronx. (PSR ¶ 39). On September 23, 2023, law enforcement officers located the defendant and placed him under arrest. (PSR ¶ 39). Subsequent to his arrest, law enforcement officers searched the apartment where the defendant had been hiding out. In that apartment, they found additional narcotics and narcotics packaging equipment, including over half a kilogram of narcotics of the same noxious mix found in the Daycare: fentanyl, para-flourofentanyl, and heroin, as well as glassines stamped with the same "Red Dawn" logo as glassines found in the traps in the Daycare, along with the "Red Dawn" stamp itself. The "Red

Dawn" glassines and stamp found in the defendant's apartment are pictured below. (PSR ¶¶ 39-40).

 

### D. The Defendant's Role

The defendant played a central role in the narcotics trafficking conspiracy run out of the Daycare, which the defendant, Herrera Garcia, and Mendez operated in concert. The trio lived and worked with drugs together. On a regular basis, the defendant, Herrera Garcia, and Mendez would work inside the Daycare and package narcotics stored there for further distribution. Sometimes they pressed powdered narcotics into kilogram-sized bricks using their kilo presses. Other times they packaged small amounts of narcotics into glassine envelopes, exactly like the envelopes stamped "Red Dawn" that were found in the traps and in the defendant's possession after the Daycare operation was tragically uncovered. The process of packing their drugs into glassines was a multi-step process that involved mixing together different types of drugs and inert substances, weighing the drugs, and ultimately placing the final product into the individually-stamped glassines for retail sale. (PSR ¶¶ 29-30).

During the course of their packaging activities, the defendant, Herrera Garcia, and Mendez used some of the very same kitchen utensils that were then used to prepare food for the children, including bowls, pans, and sponges. (PSR ¶ 32). Two nights before the children were poisoned at the Daycare, the defendant and Herrera Garcia were in the Daycare together packaging narcotics for approximately six hours, beginning just after the children had been picked-up from Daycare for the day. (PSR ¶ 28, n.7). Mendez, whose role in the narcotics trafficking conspiracy included stamping the glassines that would hold the finished fentanyl, was also in the Daycare for brief periods during this six-hour timeframe. Put simply, N.F.D.'s death and the other children's poisonings were the direct consequence of the defendant's drug trafficking activity inside the Daycare.

Furthermore, the Daycare drug operation was both long-running and extensive. Text messages found on Mendez's phones reveal that the conspiracy dates back to *at least* as early as June 2022, and on September 15, 2023 alone, there were over twelve kilograms of fentanyl and heroin in the Daycare, an amount of drugs that even by a very conservative estimate is worth hundreds of thousands of dollars. Moreover, some of the text messages exchanged reveal the extent to which the defendant, Herrera Garcia, and Mendez were all working together in a conspiracy with a relatively flat structure. For example, on December 16, 2022, Mendez

exchanged a series of text and voice messages with the defendant stating that Herrera Garcia had gotten into a dispute with a particular co-conspirator ("CC-1") and that, as a result, CC-1 was considering whether to start doing his own drug packaging work. The exchange is, in relevant part, as follows:

| | | |
|---|---|---|
| Mendez: | | Are you already awake? |
| Defendant: | | Yes. |
| Defendant: | | Why? |
| Mendez: | | To see if you can give some advice |
| Mendez: | | To that compadre of yours |
| Defendant: | | About what? |
| Mendez: | | Because [CC-1] is giving him 5 "pesos" but he's super mad, and he shouldn't act that way towards [CC-1] |
| Mendez: | | Otherwise he'll take away our work from us |
| Defendant (v):[2] | | I…I told him, I told him to take that and forget about life. When he gives the guy the other ones, I'll pay him. I'm going to bring the money to [CC-2], and I think I'll go to his place so I can bring it to him. I'm going to [CC-2's] place now to bring him the five hundred, and when I come back from there, if he wants, I'll go by, to pick it up. I'm going to tell him now.[3] |

The "compadre" being referenced is Herrera Garcia. In this exchange, Mendez is reaching-out to the defendant to talk some sense into Herrera Garcia because a dispute Herrera Garcia is having with CC-1 could result in CC-1 taking "work"—that is, drug packaging work—away from the defendant, Mendez, and Herrera Garcia. The defendant's response shows that he is actively involved in navigating this dispute. The defendant and Mendez were not individuals who simply took orders from Herrera Garcia; the three of them were working together for the success of the drug enterprise, and the discussion above demonstrates that Mendez looked to the defendant for his suasion over Herrera Garcia as to the wholesale drug affairs of the enterprise.

      The defendant was also involved in setting-up the Daycare. Records obtained from the New York Department of Health and Mental Hygiene reveal that Mendez listed the defendant as a reference on her daycare provider application, and the defendant submitted a reference form on her behalf. On that form, dated April 12, 2023, the defendant stated that Mendez is "very good with children," and rated her ability to provide a safe and loving environment as "excellent." (*See* Ex. A). All the while, the defendant knew that the space in which the Daycare would be located was a drug den used by the defendant and his co-conspirators to store and package their lethal narcotics.

---

[2] The voice recordings in the exchange are marked with a "(v)".
[3] Throughout this submission, the quoted text messages and voice recordings are in Spanish. All quotations are from certified translations.

### E. Warning Signs Leading Up to the September 15, 2023 Poisonings

The defendant's role in vouching for Mendez and establishing the Daycare as a front for the drug operation is particularly egregious given the dangers the defendant knew would be faced by any child attending that facility. Indeed, there were at least three events during the course of the conspiracy that made clear that storing and packaging narcotics in the Daycare would inevitably result in tragedy.

*First*, in October 2022, Herrera Garcia's brother died of acute fentanyl intoxication while packaging narcotics at an apartment in the Bronx. (PSR ¶ 26). Prior to that time, the defendant and others, including Herrera Garcia and Mendez, worked with the defendant's brother trafficking narcotics. (PSR ¶ 26). Crime scene photographs of the overdose scene show glassines consistent with the glassines found in the traps at the Daycare, along with narcotics packaging equipment including stamps, stamp pads, plastic bags, tape, and latex gloves. (PSR ¶ 26). Body camera footage from the officers responding to the scene shows the defendant, Herrera Garcia, and Mendez all present. A still image of that body camera footage is below, with the three co-conspirators circled in red. Instead of viewing the death of Herrera Garcia's brother as a wake-up call, however, the defendant continued packaging and trafficking in large quantities of fentanyl, including fentanyl that had been transferred from the apartment in which Herrera Garcia's brother had died to the Daycare space.[4] (PSR ¶ 27).



*Second*, the defendant had first-hand knowledge of the danger of the drugs he was trafficking. While packaging narcotics in the Daycare, the defendant, Herrera Garcia, and Mendez all became ill on multiple occasions. Despite repeated bouts of vomiting from the drug exposure, they persisted in their activities, undeterred by the physical harm their narcotics caused to themselves or others. (PSR ¶ 35).

---

[4] Herrera Garcia began leasing the Daycare space at least as early as June 2022, but it only began to be used as a functioning daycare in June 2023.

*Third*, in December 2022, approximately two months after the death of Herrera Garcia's brother, Herrera Garcia's and Mendez's child became sick after being in the Daycare space. (PSR ¶ 35). The defendant and Mendez were afraid to take the child—then a toddler—to the hospital because they feared he would test positive for drugs, though they ultimately did so. (PSR ¶ 35). Although the Government does not have documentary evidence that the defendant was informed of this event, the defendant was, at that time, participating in a massive drug conspiracy with Mendez and Herrera Garcia and living together with them and their minor child. As a result, it strains credulity to think he would not have been aware of the incident.

## II.    Procedural History and Guidelines Calculation

On May 23, 2024 the defendant pled guilty to Count One of the S1 indictment, conspiracy to distribute and possess with intent to distribute narcotics, in violation of 21 U.S.C. § 846, pursuant to a plea agreement with the Government (the "Plea Agreement"). The count carries a mandatory minimum sentence of 10 years' imprisonment.

Consistent with the Plea Agreement, Probation calculates the defendant's Guidelines range as a base level 38, with enhancements for (i) maintaining a premises for the purpose of manufacturing or distributing controlled substances; (ii) the victim of the offense being a vulnerable victim; and (iii) being an organizer or leader. (PSR ¶¶ 63-69). After a three-point deduction for acceptance of responsibility, Probation calculates the defendant's offense level as 43, with a criminal history category of I. (PSR ¶¶ 71-74, 77). Accordingly, Probation's calculated Guidelines range is life imprisonment. The Government agrees with that calculation.

## III.    Discussion

### A.    Applicable Law

As the Court is well-aware, the Sentencing Guidelines still provide guidance to sentencing courts following *United States* v. *Booker*, 543 U.S. 220 (2005), and *United States* v. *Crosby*, 397 F.3d 103 (2d Cir. 2005). District courts must treat the Guidelines as the "starting point and the initial benchmark" in sentencing proceedings. *Gall* v. *United States*, 128 S. Ct. 586, 596 (2007).

Following a court's calculation of the appropriate Guidelines range, a sentencing judge must consider the seven factors outlined in Title 18, United States Code, Section 3553(a), when imposing a sentence. *Id.* & n.6. They are: (1) "the nature and circumstances of the offense and the history and characteristics of the defendant"; (2) the purposes of sentencing, as set forth below; (3) "the kinds of sentences available"; (4) the Guidelines range itself; (5) any relevant policy statement by the Sentencing Commission; (6) "the need to avoid unwarranted sentence disparities among defendants"; and (7) "the need to provide restitution to any victims," 18 U.S.C. § 3553(a)(1)-(7).

In determining the appropriate sentence, the statute directs judges to "impose a sentence sufficient, but not greater than necessary, to comply with the purposes" of sentencing, which are:

|     |     |
| --- | --- |
| (A) | to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense; |
| (B) | to afford adequate deterrence to criminal conduct; |
| (C) | to protect the public from further crimes of the defendant; and |
| (D) | to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner. |

18 U.S.C. § 3553(a)(2).

### B. A Sentence of at Least 40 Years' Imprisonment Is Appropriate in This Case

The Government respectfully submits that consideration of the 3553(a) factors—in particular (i) the need for the sentence imposed to reflect the nature and seriousness of the offense and provide just punishment; (ii) the need to afford adequate deterrence; (iii) the need to protect the public; and (iv) the need to avoid unwarranted sentencing disparities—each call for a very substantial sentence in this case, one the Government believes should be no less than 40 years.

#### 1. The Nature and Seriousness of the Offense

The defendant's offenses were extremely serious and resulted in profound and lasting harm to each of the involved families. N.F.D. lost his life. N.F.D.'s parents lost their son. N.F.D.'s siblings lost their brother. A.G.'s family may forever be dealing with the health consequences of his near-death experience. (PSR ¶¶ 53-54). Only time will tell whether there are any long-term impacts to J.L. and K.G. from receiving toxic doses of fentanyl at such a young age. And yet the harm that occurred here was not as great as it could have been. Given the quantity of fentanyl that was in the Daycare, it is nothing short of a miracle that three other children were not killed by the defendant's conduct.

Moreover, as the Court emphasized at the sentencing of Herrera Garcia, the children at the Daycare are simply the most identifiable of the defendant's victims. The countless victims of the opioid crisis, injured and killed by fentanyl and its analogues distributed by traffickers like the defendant, are a testament to the destructiveness of the defendant's conduct. The defendant not only placed the families who trusted the Daycare with their young children at risk, he ignored the danger to countless others and—based on the sheer volume of narcotics that were in the Daycare on the day of the poisonings alone—placed many other individuals and communities in harm's way.

Additionally, the defendant's role in causing this harm was substantial. His involvement with drugs was extensive, dating back *at least* to before the death of Herrera Garcia's brother in October 2022. The over twelve kilograms of drugs present in the Daycare on September 15, 2023 (one kilogram in a closet and over eleven in the traps) were not there as a result of a one-time drug deal. The Daycare space was designed to be a drug den, with traps built into the floor and hidden underneath cribs and playmats. It was stocked with the heavy equipment of the drug trade—kilo presses, additional press parts, and even a hydraulic jack. Inside the traps there were significant amounts of packaging materials, including numerous and well-worn stamps and stamp pads, suggesting repeated and long-term use. This was not a casual or fleeting enterprise. It was a long-term drug packaging and trafficking enterprise.

Like Herrera Garcia, Parra Paredes was involved in every aspect of this operation. He pounded narcotics stash into kilogram-sized bricks for wholesale distribution and he blended different drugs and inert substances (also known as "cut") together to create narcotics for distribution. (PSR ¶¶ 29-30). All the more horrifying is the fact that the defendant intentionally did those things *inside a working children's daycare center*. Indeed, two nights before the children were poisoned, the defendant and Herrera Garcia were milling drugs in the Daycare for nearly six hours, entering just after the babies were picked-up by their mothers and leaving in the late-night hours. As noted above, it is nearly certain that the defendant's conduct that night directly contributed to the poisonings in this case.

Other details of the defendant's conduct compound the egregiousness of his offenses and render them more abhorrent. *First*, the warning signs that this tragedy was going to occur could not have been clearer, and the defendant wantonly ignored them all. When Herrera Garcia's brother died of a fentanyl overdose while packaging narcotics in October 2022, the defendant did not stop engaging in narcotics trafficking. Instead, the operation moved the remaining narcotics from Herrera Garcia's brother's apartment—that is, narcotics that had already proved lethal—to the Daycare space.[5] When the defendant and his co-conspirators then themselves became sick while packaging their narcotics in the Daycare space, they similarly did not stop what they were doing. Instead, they vastly increased the level of risk associated with their enterprise by opening a daycare in the very same space they used to store and package their drugs. Even the fact that Herrera Garcia and Mendez's own child became sick after eating something in the Daycare space did not put a stop to their conduct. With a full understanding of the dangers their actions posed, the defendant and his co-conspirators decided to use a Daycare as a front for their scheme and the defendant lent his name and assurances of Mendez's fitness for the job to the effort. The co-conspirators took the riskiest course possible, inviting other people's children into their deadly drug operation, explicitly warranting they would keep those children safe. This plan was so outrageous and the resulting harm so inevitable that N.F.D. and J.L. did not last a week in Mendez's care before being poisoned.

*Second*, the defendant was involved in helping Mendez set up the Daycare. As described above, the defendant was one of Mendez's references to the New York City Department of Health in connection with Mendez's application for a license to open a daycare. In that reference, the defendant attested that Mendez was good with children and would be "excellent" at keeping them safe. The defendant made these statements fully aware that there were kilograms upon kilograms of fentanyl lying under the floor tiles where the children would play and sleep, and knowing full well that he and his co-conspirators were engaging in large-scale narcotics packaging operation on a near-nightly basis in the same space where the children's food would be prepared, where the children would eat their meals, and where the children would crawl across the floor.

*Third*, there is every indication that even the tragedy that is this case—that is, even the death of one child and the near death of three others—did not put an end to the defendant's commitment to narcotics trafficking. As set forth above, following the defendant's arrest, law

---

[5] The Daycare was not at that time operational, but plans for it were shortly underway. Mendez submitted an application to become a daycare provider to the New York State Office of Children and Family Services at least as early as December 1, 2022, approximately six weeks after the death of the defendant's brother.

enforcement officers searched the apartment in which he had been hiding out following the poisonings at the Daycare. In that apartment, they found additional narcotics and the supplies used to package narcotics for distribution, including glassines bearing the exact stamp found on the glassines stored in the traps at the Daycare.

Thus, the seriousness of the defendant's conduct, the depth and breadth of the harm inflicted, and justice itself call for the imposition of an extremely lengthy sentence.

### 2. The Need to Afford Adequate Deterrence

The need for deterrence in this case weighs just as far in favor of a lengthy sentence as does the seriousness of the conduct.

With respect to specific deterrence, it seems there is nothing that will keep the defendant from trafficking in lethal narcotics. The defendant did not stop after he witnessed Herrera Garcia's brother, a co-conspirator, die from packaging narcotics. Instead, the remaining drugs from Herrera Garcia's brother's apartment were moved into the Daycare space. Nor did the defendant stop when he, Herrera Garcia, and Mendez became ill on a regular basis packaging their poison. Indeed, it is even apparent that the September 15, 2023, poisonings of the babies did not deter the co-conspirators generally, or the defendant specifically. Instead of attending to the dying children on September 15, 2023, Herrera Garcia grabbed at least some of his drugs that were in the Daycare and headed out the back door. The fact that he rescued the drugs suggests that he had every intention for the conspiracy to continue, even in the face of extraordinary tragedy. Moreover, the fact that the defendant had drugs and drug packaging materials in the apartment in which he was staying in the wake of the poisonings, confirms that, like Herrera Garcia, the defendant had every intention of continuing to engage not just in the drug trade, but in continuing to trade the kind of drugs that had already killed one co-conspirator, sickened at least three others, killed one innocent child, and nearly killed three others. If those events were not enough to deter the defendant it is hard to imagine what would be.

A lengthy sentence in this case is also particularly important to deter others from engaging in similar conduct. The defendant and his co-conspirators decided that a daycare was an effective front for a drug den because law enforcement would be unlikely to look. Such thinking cannot be permitted to ever happen again—not by even one more narcotics trafficker. Parents should not have to fear that when they leave their child at a daycare, or a school, or a camp, or with a babysitter, that their child will be poisoned with illegal narcotics. Drug traffickers need to understand that hiding their illegal activities behind children will be met with the most serious of consequences.

Accordingly, both the goals of specific and general deterrence weigh in favor of a particularly lengthy sentence in this case, one that the Government submits should be at least 40 years.

### 3. The Need to Protect the Public

There is also a need to protect the public from additional drug trafficking conduct by the defendant. Although the defendant does not have prior criminal narcotics convictions, as set forth

above, the narcotics operation was long-running and significant. Additionally, as discussed at length above, given the defendant's failure to change his ways even in the face of the multiple drug-related tragedies, there is little reason to think that the defendant will cease his deadly illegal activities.

### 4. The Need to Avoid Unwarranted Sentencing Disparities

The need to avoid unwarranted sentencing disparities also calls for a very significant sentence in this case. The Government views the culpability of the defendant as only slightly less than that of Herrera Garcia. Although Herrera Garcia was the one who rented the Daycare space, the defendant lived with Herrera Garcia and Mendez at the time and was in the Daycare space on a near daily basis. The defendant and Herrera Garcia packaged drugs alongside each other and both dealt with customers and clients. They were also both involved for an extensive period of time, dating back to *at least* before the death of Herrera Garcia's brother in 2022.

Like Herrera Garcia, the defendant was also more than aware that the space in which he and his co-conspirators were storing their drugs was used as a Daycare. As noted above, he helped establish the Daycare entity itself by serving as a reference for Mendez in her application to the authorities for a license. After doing so, the defendant moved around the cribs and playmats on a regular basis to access the traps where the narcotics were stored, conduct that should have served as a daily reminder of the dangers to which the defendant was subjecting very young children.

Unlike Herrera Garcia, the defendant was not in the Daycare in the immediate aftermath of the poisonings, so he did not step over dying children in order to swiftly remove narcotics from the space before the arrival of emergency services. But a week after the poisonings, more narcotics and narcotics packaging equipment were found in the apartment where the defendant was staying.

Finally, while the defendant did not flee the country Herrera Garcia did, he did flee the area, immediately moving out of the apartment he shared with Herrera Garcia and Mendez and hiding out at another location in the Bronx in the wake of the poisonings.

On balance, therefore, we view the defendant as only slightly less culpable than Herrera Garcia.



**IV.     Conclusion**

      For the reasons set forth above, the Government respectfully requests that the Court sentence the defendant to a significant term of imprisonment, which the Government submits should be no less than 40 years. Such a sentence would punish the defendant for the irreparable damage he has caused and protect the public from the damage he could again. The Government submits that such a sentence would be sufficient but not greater than necessary to serve the legitimate purposes of sentencing.

                                     Respectfully submitted,

                                     DAMIAN WILLIAMS
                                   United States Attorney

        By:      /s/
                                   Maggie Lynaugh
                                   Brandon Thompson
                                   Assistant United States Attorneys


cc: John Kaley, Esq. (by ECF & Email)
    Yusuf Elashmawy, Esq. (by ECF & Email)